UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

CARLOS ISAAC,

                    Plaintiff,

           -v-

THE CITY OF NEW YORK, CORIZON, INC.,
CORIZON HEALTH, INC., CORIZON HEALTH
CLINICAL SOLUTIONS, LLC, CORRECTIONAL
MEDICAL ASSOCIATES OF NEW YORK, P.C.,
New York City Police Department Officer ("P.O.")
JUAN CABRERA (Shield No. 26123), JOHN DOE
(Shield No. 3783), W. HOLMES  (Shield No. 18553),
JOON PARK, MD, CARLOS  CABAN, RUBEN
MOREL, CATERINA BARONE,  RODRIGUE
JOSEPH, M.D, JEAN LARECE, LAALI ALI, M.D.,
WIN MOUK, R.N., JAY COWAN, M.D.,THOMAS
SCHWANER P.A., DAVID VIERA, P.A., P.O. JOHN
DOEs, and JOHN ROEs,

                    Defendants.
_____

SECOND AMENDED
COMPLAINT AND DEMAND
FOR A JURY TRIAL

Index No. 17 Civ. 1021 (PGG)

Plaintiff Carlos Isaac, by his attorney Gillian Cassell-Stiga of Beldock Levine & Hoffman LLP, for his amended complaint, does hereby state and allege:

**PRELIMINARY STATEMENT**

1. This is a civil rights action brought to vindicate plaintiff's rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983, along with pendent claims under the laws of the State of New York.

2. Plaintiff Carlos Isaac's rights were violated when officers of the New York City Police Department ("NYPD") unconstitutionally detained and arrested plaintiff despite the absence of probable cause.  By reason of defendants' actions, including the unreasonable and unlawful seizure of his person, plaintiff was deprived of his constitutional rights.

1

3.  Plaintiff also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§1331, 1343(a)(3-4). This action is brought pursuant to 42 U.S.C. §§1983 and 1988 for violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States.

5.  Venue is proper pursuant to 28 U.S.C. §1391(b)(2) in that plaintiff's claim arose in the Southern District of New York.

6.  An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

## PARTIES

7.  Plaintiff Carlos Isaac is, and was at all times relevant to this action, a resident of the County of Bronx in the State of New York.   Mr. Isaac was diagnoses with the human immunodeficiency virus in 1992, for which he is prescribed antiretroviral medications. Additionally, Mr. Isaac suffers from Hepatitis C, Epilepsy, Neuropathy, and ailments related to his immunodeficiency not limited to but including psoriasis.   Mr. Isaac is also prescribed methadone for his prior developed drug dependence.

8.  Defendant The City of New York is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York.   It is authorized by law to maintain a police department ("NYPD") and correction department ("DOC") which acts as its agent in the area of law enforcement and for which it is ultimately responsible.   Defendant The City of New York assumes the risks incidental to the maintenance of a police force and police officers as said risks attach to the public consumers of the services provided by the NYPD.

9.  NYPD Officer ("P.O.") Juan Cabrera (Shield No. 26123) ("Cabrera"), John Doe (Shield No. 3783), W. Holmes  (Shield No. 18553),  and P.O. John Does are and were at all times relevant herein duly appointed and acting officers, servants, employees and agents of defendant The City of New York and/or municipal agencies of defendant The City of New York, including the NYPD and DOC. All aforenamed defendants are and were at all times relevant herein acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees of defendant The City of New York, were acting for, and on behalf of, and with the power and authority vested in them by defendant The City of New York, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.  The aforenamed defendants are sued in their individual capacities.

10. Defendants Corizon, Inc., Corizon Health, Inc., Corizon Health Clinical Solutions, LLC, Correctional Medical Associates of New York, P.C., will be collectively known as ("Corizon"). Defendants Corizon are corporations that have contracted with The City of New York to provide health services to pretrial detainees in the custody of The City of New York. Defendants Corizon engage in business in the State of New York and are subject to personal jurisdiction in this district, and have provided health care services on behalf of defendant The City of New York.

11. Defendants Joon Park, M.D., Carlos Caban, Ruben Morel, Caterina Barone,  Joseph Rodrigue, M.D., Jean Larece, Laali Ali, M.D., Win Mouk, R.N., Jay Cowan, M.D., Thomas Schwaner, P.A.,  David Viera, P.A., and John Roes were at all times relevant herein employees or agents of Corizon, and were acting under color of state law in the course and scope of their duties and functions as agents, servants, and employees of Corizon, and

3

otherwise performed and engaged in conduct incidental to their lawful functions in the course

of their duties.  They were acting for and on behalf of defendants The City of New York and

Corizon, at all times relevant herein, with the power and authority vested in them as agents

and employees of defendants The City of New York and Corizon, and incidental to their

duties as agents and employees of defendants The City of New York and Corizon.  They are

sued in their individual and agency capacities.

12. P.O. Juan Cabrera (Shield No. 26123), John Doe (Shield No. 3783), W. Holmes (Shield No.
    18553), Joon Park, M.D., Carlos Caban, Ruben Morel, Caterina Barone,  Joseph Rodrigue,
    M.D., Jean Larece, Laali Ali, M.D., Win Mouk, RN, Jay Cowan, M.D., Thomas Schwaner,
    P.A.,  David Viera, P.A., and P.O. John Does, and John Roes are referred to collectively as
    the "individual defendants." [1]

13. At all times relevant herein, the individual defendants were acting under color of state law in
    the course and scope of their duties and functions as agents, servants, employees and officers
    of the NYPD, DOC, or Corizon, and otherwise performed and engaged in conduct incidental
    to the performance of their lawful functions in the course of their duties. They were acting
    for and on behalf of the NYPD, DOC, or Corizon at all times relevant herein, with the power
    and authority vested in them as officers, agents and employees of the NYPD, DOC, or
    Corizon and incidental to the lawful pursuit of their duties as officers, employees and agents
    of the NYPD, DOC, or Corizon.

14. The individual defendants' acts hereafter complained of were carried out intentionally,
    recklessly, with malice, and in gross disregard of plaintiff's rights.

---

[1]    By identifying said defendants as "John Doe" or "John Roe," plaintiff is making no representations as to
the gender of said defendants.

15. At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

16. The true name and shield numbers of defendant P.O. John Does are not currently known to the plaintiff. However, they were employees or agents of the NYPD on the date of the incident. Accordingly, they are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to New York State General Municipal Law § 50-k. The Law Department, then, is hereby put on notice (a) that plaintiff intends to name said officers as defendants in an amended pleading once the true name and shield number of said defendants becomes known and (b) that the Law Department should immediately begin preparing their defense in this action.

## STATEMENT OF FACTS

17. On January 22, 2015 at approximately 10:10 p.m., Mr. Isaac was unlawfully arrested by P.O. Cabrera and P.O. Doe at 148th Street and Brook Avenue in Bronx County in the State of New York.

18. Mr. Isaac left home to make a purchase from a convenience store.

19. As Mr. Isaac exited the store, he exchanged words with an individual standing nearby.

20. Immediately after Mr. Isaac crossed the street, P.O. Cabrera and P.O. Doe approached Mr. Isaac and placed him under arrest.

21. Mr. Isaac had committed no crime or violation and P.O. Cabrera and P.O. Doe did not have objective probable cause to believe he had.

22. Mr. Isaac was taken to the 40th precinct where he was invasively searched.

23. After his arrest, Mr. Isaac informed his arresting officers, P.O. Cabrera and P.O. Doe, that he required his prescription medication but was not given access to such.

24. On January 23, 2015, while at central booking, Mr. Isaac informed officers, including P.O. John Doe (Shield No. 3783) of his physical illness and his need for his prescription medications and yet was not provided any of his prescribed medications.

25. Mr. Isaac was charged with felony sale and possession of a controlled substance, bail was set, and he was transferred to Rikers Island.

26. The charges against Mr. Isaac were based upon the false statements of P.O. Cabrera and P.O. Doe.

27. The false statements were forwarded by P.O. Cabrera and P.O. Doe to prosecutors and cause the prosecution of Mr. Isaac as well as the formation of public records containing untrue allegations of his criminal activity.

28. On or about on January 24, 2015, Mr. Isaac informed officers, including W. Holmes (Shield No. 18553), of his physical illness and his need for his prescription medications and yet was not provided any of his prescribed medications.

29. After he was transfer to Rikers, Mr. Isaac began to deteriorate rapidly and displayed the physical signs of being in medical distress including fevers, sweats, chills, and severe pain and swelling in both of his legs.

30. Mr. Isaac did not receive any of his prescribed medications through the time he was finally reviewed by intake medical staff on January 25, 2015 – three days after his arrest.

31. At the time of Mr. Issac's arrest and transfer to Rikers, defendants had access to Mr. Isaac's medical records and history, and knowledge of his most recently prescribed doses of

medications, including but not exclusive to antiretrovirals, azithromycin, sulfamethoxazole, gabapentin, methadone, and albuterol.

32. Although the defendants knew or should have known of Mr. Isaac's serious and life threatening medical conditions and his medically necessary prescribed medications, the defendants failed to provide the medically necessary doses of Mr. Isaac's medications.

33. On January 25, 2015, upon information and belief Mr. Isaac's medical condition was finally reviewed by defendants Joon Park, M.D and Jay Cowen, M.D., and Win Moul, R.N.

34. Additionally, after the medical review on January 25, 2015, defendants still failed to provide the medically necessary doses of Mr. Isaac's medications.

35. Between January 26th and January 29th, Mr. Isaac's medical condition and care was also reviewed by defendants Carlos Caban, David Viera, Caterina Barone, Ruben Morel, Dr. Joseph Rodrigue, M.D., and Jean Larece.

36. On or before February 11, 2015, Mr. Isaac's medical condition and care was also reviewed by defendant Laali Ali, M.D. and Thomas Schwaner, P.A.

37. After January 25, 2015, Mr. Isaac was prescribed by defendants 400 mg of gabapentin, only half the 800 mg dose of gabapentin he had been receiving immediately prior to entering defendants' custody.  This further exacerbating the inflammation that had developed since Mr. Isaac entered defendants' custody and caused the rapid deterioration of his legs.

38. Mr. Isaac was prescribed a methadone detox drug at a dose scheduled to be rapidly tapered to nothing within a week.  This forced methadone detox was pursuant to a City policy of forced detox of individuals with methadone dependency, despite evidence of successful management of their drug dependency through state and federal government approved methadone programs.

39. The delay in medical treatment and the decision not to provide Mr. Isaac with the known medically necessary doses of his prescription medications caused the pain and swelling in Mr. Isaac's legs to become so severe that Mr. Isaac could no longer walk.

40. The delay in medical treatment and the decision not to provide Mr. Isaac with the known medically necessary doses of his prescription medications caused Mr. Isaac's overall health to rapidly deteriorate, and caused obvious systems of physical distress including fevers, sweats, and chills. Mr. Isaac also developed open lesions on his torso that bled.

41. The individual defendants failed to take action, despite Mr. Isaac's verbal request for his necessary doses of prescribed medications, and ignored his physical symptoms of extreme medical distress, pursuant to a custom, policy, and practice of denying medical care to those incarcerated persons undergoing forced methadone detox.

42. Mr. Isaac was not monitored nor evaluated by a medical professional with necessary medical qualifications and expertise concerning the impact of such a drastic detox on Mr. Isaac's frail immune system.

43. Despite Mr. Isaac's obvious medical distress and verbal request for his medically necessary doses of prescribed medications, the individual defendants failed to properly prescribe Mr. Isaac's prescriptions through February 11, 2018.

44. On February 12, 2018, Mr. Isaac was transferred to Bellevue hospital.

45. At this point, Mr. Isaac's medical condition was so severe he remained hospitalized for approximately two weeks until he was ultimately transferred back to Rikers.

46. The individual defendants acted recklessly and with a deliberate indifference to Mr. Isaac's medical needs.

8

47. Defendants Joon Park, M.D., Carlos Caban, Ruben Morel, Caterina Barone, Joseph Rodrigue, M.D., Jean Larece, Laali Ali, M.D., Win Mouk, R.N., Jay Cowan, M.D., Thomas Schwaner, P.A., David Viera, P.A., and John Roes violated their duty of care by reviewing Mr. Isaac's medical condition, learning from Mr. Isaac of his illness and prescribed medications, observing his rapid physical deterioration, and failing to provide Mr. Isaacs with his prescribed medication or medically necessary and adequate care.

48. Due to medical complications resulting from the defendants' failure to provide adequate medical care, Mr. Isaac's condition worsened to the point that hospitalization was necessary.

49. After his transfer from Bellevue Hospital back to Rikers, Mr. Isaac remained in the custody of the DOC until his release on or about August 22, 2015.

50. All charges against Mr. Isaac were dismissed on or about October 8, 2015.

51. As a result of the unlawful arrest and detention, and defendants' failure to provide adequate care, plaintiff experienced pain, mental anguish, and physical injury.

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. §1983**
(*Against the individual defendants*)

52. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

53. By their conduct and actions in falsely arresting plaintiff, falsely imprisoning plaintiff, fabricating evidence, abuse of process, malicious prosecution, failing to provide medical treatment, and by failing to intercede to prevent the complained of conduct, the individual defendants, acting under color of law and without lawful justification, intentionally, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts, caused injury and damage in violation of plaintiff's constitutional

rights as guaranteed through 42 U.S.C. § 1983 and the United States Constitution, including its Fourth, Fifth, Sixth, and Fourteenth Amendments.

54. As a result of the foregoing, plaintiff was deprived of liberty, suffered physical injury, conscious pain and suffering, emotional distress, humiliation, loss of property, costs and expenses, and was otherwise damaged and injured.

## SECOND CLAIM FOR RELIEF
## LIABILITY OF THE CITY OF NEW YORK FOR CONSTITUTIONAL VIOLATIONS
### (*Against the City of New York and Corizon*)

55. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

56. At all times material to this complaint, defendants The City of New York and Corizon had de facto policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

57. At all times material to this complaint, defendants The City of New York and Corizon were deliberately indifferent to their failure to provide adequate medical care for inmates held in DOC custody.

58. At all times material to this complaint, defendants The City of New York and Corizon failed to properly train, screen, supervise, or discipline employees, and failed to inform the individual defendants' supervisors of their need to train, screen, supervise or discipline individual defendants, failed to adequately review medical intake of inmates with serious known medical conditions, and failed to adequately review medical complaints of inmates with serious known medical conditions or have such review conducted by a person with sufficient institutional and medical training and knowledge.

59. Corizon is a company which seeks to maximize shareholder value.

60. At the time of Mr. Isaac's detention, as The City of New York knew or should have known, Corizon's medical and mental health providers nationwide routinely failed to conduct adequate rounds or clinical examinations of their patients, routinely failed to accurately maintain or review patients' charts, and routinely denied patients access to needed doctors and medication, all of which placed the health and lives of Corizon's patients at risk. These are the very policies, practices and customs that caused injury to Mr. Isaac.

61. The aforementioned customary and known practices resulted from cost-cutting measures adopted by Corizon to maximize profits by, among other things, inadequately staffing facilities, employing unqualified staff, failing to train or vet staff, and delaying and denying life-saving care even in emergency situations.

62. Corizon is a for-profit, billion-dollar company that was formed in 2011 when its predecessor, Correctional Medical Services, Inc. ("CMS"), merged with PHS Correctional Healthcare ("PHS"). Under each of these names, Corizon has had a long and well publicized history of sacrificing the health and lives of inmates for profit. Corizon, which operates in hundreds of correctional facilities in dozens of states, uses the same profit-maximizing approach nationwide: "[T]heir whole goal," one Arizona judge has observed, "is how not to do any work."[2]

63. For decades, through Department reports, civil litigation, and media reports, DOC and defendant The City of New York has been aware of the routine, dangerous, and constitutionally inadequate medical care at Riker and provided by Corizon.

---

[2] Arizona prisons in health-care quandary, Bob Ortega - Feb. 16, 2012 11:05 PM, The Republic, available at: azcentral.com - http://archive.azcentral.com/arizonarepublic/news/articles/20120210arizona-prisons-health-care-quandary.html.

64. Three years before Mr. Isaac's detention, the Eleventh Circuit affirmed a jury finding that Corizon pursues a policy of denying medical treatment to inmates, and even refusing to send prisoners on the brink of death to hospitals, in order to save money. In *Fields v. Corizon Health, Inc.*, 490 F. App'x 174 (11th Cir. 2012), the jury confirmed that this policy had caused the gruesome suffering and permanent paralysis of Brett Fields. Mr. Fields had complained of a severe bacterial infection for several weeks, but a PHS nurse refused to send him to the hospital and instead gave him Tylenol even as his legs began to twitch, he lost his ability to walk, and his intestines descended out of his rectum. The Eleventh Circuit affirmed the jury's finding that Mr. Fields's anguish resulted from PHS's policy of "delay[ing] treatment to save money," which it "implemented . . . with deliberate indifference as to the policy's known or obvious consequences" for the company's patients. *Id.* at 184-85 (internal quotation marks and alterations omitted).

65. According to published reports, Jovon Frazier likewise died because of Corizon's profit-seeking practice of denying patient detainees access to outside doctors or facilities, or even to Corizon doctors or physicians assistants. Despite months of persistent and increasingly desperate complaints of severe pain, Mr. Frazier was allowed to see only nurses and never a doctor, and he was offered no treatment other than Tylenol. When he was finally taken to a hospital, a cancerous mass was discovered in his shoulder. It cost him first his left arm and then, in September 2011, his life. A 2014 investigation by the Palm Beach Post revealed that Mr. Frazier was only one of numerous Florida prisoners—Donna Pickelsimer, Anthony Carvajal, and Tammie White among them—whose end-stage cancer symptoms were disregarded by Corizon employees and treated with Tylenol and ibuprofen.

66. In Florida, a 2015 investigation into Corizon's medical care at the Florida Women's Reception Center in Ocala found that a woman with diabetes had gone almost three months without insulin, inmates at risk of self-harm were denied psychiatric care while being held in isolation far longer than regulations allowed, and mentally ill inmates were inexplicably taken off their prescribed psychiatric medications.

67. By January 2013, approximately 100 days after Florida turned over healthcare for the vast majority of its inmates to Corizon, the monthly inmate death count shot to a ten-year high, while the number of critically ill prisoners sent for hospital treatment plummeted. These were far from the only victims of Corizon's inhumane penny-pinching practices.

68. Audits and reviews of Corizon in other states reflect the same custom and policy of providing substandard care to cut costs. A February 2012 report of Corizon's performance in Idaho concluded that the company was deliberately indifferent to the medical needs of prisoners. Just as Mr. Haley's medical needs were not being seriously considered, terminally ill and long-term care prisoners in Idaho were left on soiled linens, given inadequate pain medication, and forced to endure long periods without food or water. Responses to prisoners' requests for medical attention were delayed, or their requests were entirely ignored; the same was true in emergency care situations, as inadequately trained staff working without the supervision of registered nurses or physicians were slow to respond. The Idaho report found Corizon staffing inadequate and incompetent, and mental healthcare deficient. Corizon staff kept incomplete records and failed to follow up with patients or provide face-to-face evaluations of individuals prescribed psychotropic medications. Corizon's operations in Idaho failed 23 of 33 audit categories in 2010 and 26 of 33 categories in 2011.

69. Similar deficiencies were found in a November 2011 audit of CMS's performance in Maine prisons: 38% of patient files had inadequate or inaccurate documentation or were inadequately maintained; 11% of sick calls were never or not timely resolved; staff was inadequately trained; and medications were routinely improperly administered. When Maine refused to renew Corizon's contract in 2012, prisoner complaints about their medical care precipitously dropped.

70. A 2014 report detailing failures of medical care by Corizon in Alabama prisons attributed multiple deaths and serious injuries to "extraordinary understaffing," which caused crises including the failure to monitor diabetic patients and slow or nonexistent emergency responses.

71. The Alabama report echoes one from Arizona issued in October 2013, which likewise details cases of Corizon's neglect and mistreatment of inmates. In surveys, Corizon nurses in Arizona confirmed the blistering contents of the report, relating that patients were deprived of urgent medical care because facilities were understaffed and the limited medical personnel who were available were inadequately trained.

72. Meanwhile, in September 2013, approximately three years before Mr. Isaac's detention, Louisiana canceled its contract with Corizon, and six Corizon employees subsequently resigned in light of seven health-care related deaths that occurred in the state's prisons over as many months in 2012. At least three of the deaths were preventable. On August 8, 2012, Samantha George, a severe diabetic also suffering from a bacterial infection, died after complaining of fever and pain. While Ms. George lay in her cell partially naked and unresponsive, Corizon staff repeatedly peered into her cell but did nothing to assist her. The

14

only doctor on duty was off-site and told the nurse who contacted him that he would examine Ms. George the following day. By then, Ms. George was dead.

73. Corizon and CMS's pattern of delayed or denied medical care killed at least nine additional people and caused serious or critical injuries to 21 others in Minnesota before the state cancelled its contract with Corizon in 2013. A 2014 audit of Corizon's performance in Minnesota found that the deaths and injuries were in large part attributable to inadequate staffing. In order to cut costs, on weekdays after 4:00 p.m. and on weekends, Corizon paid a single doctor to be on call for the entire state prison system.

74. According to published accounts, one Minnesota victim of this policy was Xavius Scullark-Johnson, a schizophrenic man. In May 2013, Mr. Scullark-Johnson suffered seven seizures in his cell, where he was left for nearly eight hours with no care. He was found soaked in urine on the floor of his cell, but still no ambulance was called for several more hours. When the ambulance finally arrived, a Corizon nurse turned it away because allowing Mr. Scullark Johnson to travel by ambulance to a hospital would have violated Corizon protocols designed to cut costs. Without access to hospital care, Mr. Scullark-Johnson soon died.

75. Lawsuits throughout the country, in Alabama, Arizona, California, Forida, Idaho, Indiana, Iowa, Louisiana, Maine, Minnesota, Missouri, New Mexico, and New York, among other states, detail what one D.C. municipal lawmaker identified in 2015 as Corizon's "deeply troubling track record of human rights abuses."

76. As The City of New York was contracting with Corizon to care for Mr. Isaac and his fellow inmates, other states were cancelling their contracts with Corizon one by one, faced with the suffering and death that Corizon's cost-cutting measures produced. Corizon lost contracts with state prisons in Vermont (2005), Alabama (2007), Delaware (2010), Maryland (2010),

and Maine (2012), and with county jails in Galveston, Texas (2007), Pima County, Arizona (2008), and Monroe County, New York (2010), almost always following allegations by officials that the company was not providing adequate healthcare. These contract terminations were followed by others in Minnesota, Pennsylvania, Tennessee, Washington, D.C., and Volusia County, Florida, among other jurisdictions.

77. The City of New York, meanwhile, waited until 2015 before reevaluating its contract with Corizon. Between 2009 and 2015, Corizon's provision of substandard medical care had been found by The New York State Commission of Correction (SCOC) to have caused up to a dozen deaths at Rikers. By the time The City of New York cancelled its contract with Corizon, it was too late for those dozen individuals, including Mr. Isaac. The City of New York was deliberately indifferent to the known, well-publicized and widely decried unconstitutional policies, practices, and customs of Corizon, and this delay and deliberate indifference caused Mr. Isaac's injury.

78. At the time of Mr. Isaac's detention, Corizon knew that its deliberate strategy of cutting costs to maximize profits placed those in its care at serious risk of grave illness and even death by among other things, understaffing facilities, inadequately screening and training employees, and denying patients access to needed care. The City of New York likewise knew or should have known of Corizon's deadly practices, but they disregarded the wellbeing of the individuals in their custody, with severe consequences for Mr. Isaac among so many others.

79. At all times material to this complaint, defendant Corizon was deliberately indifferent to its failure to provide adequate medical care for inmates held in DOC custody.

80. At all times material to this complaint, defendant Corizon failed to properly train, screen, supervise, or discipline employees, and failed to inform the Individual Defendants' and their

supervisors of their need to train, screen, supervise or discipline employees. For decades, through Department reports, civil litigation, and media reports, the DOC has been aware of the routine, dangerous, and constitutionally inadequate medical care.

81. At the time of Mr. Isaac's detention, "[t]he company [Corizon] ha[d] been accused by state investigators for medical failures that played a role in up to a dozen deaths at Rikers."[3]

82. Several entities have conducted major investigations into patterns of abuse at Rikers Island, including the United States Attorney's Office for the Southern District of New York, the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, and the New York Times.

83. The problems at Rikers Island are of such a magnitude, The City of New York announced the intent to shut down the whole jail complex. Former Chief Judge Jonathan Lippman and City Council Speaker Melissa Mark-Viverito stated: "Rikers Island is an affront to the civic values of New York City. Reforming our jail system and closing Rikers Island is not simply good public policy — it is a moral imperative."[4]

84. At the time of Mr. Isaac's detention, "[t]he company [Corizon] ha[d] been accused by state investigators for medical failures that played a role in up to a dozen deaths at Rikers."[5]

85. On June 10, 2015, defendant The City of New York announced it would not renew its contract with defendants Corizon.[6] This was during Mr. Issac's detention, and yet many

---

[3]Michael Winerip and Michael Schwirtz, *New York City to End Contract With Rikers Health Care Provider*, N.Y. Times (June 10, 2015), https://www.nytimes.com/2015/06/11/nyregion/report-details-failings-of-corizon-rikers-island-health-provider.html?_r=0

[4]Jonathan Lippman and Melissa Marl-Viverito, *Closing Rikers Island Is a Moral Imperative*, NY Times (March 31, 2017), https://www.nytimes.com/2017/03/31/opinion/closing-rikers-island-is-a-moral-imperative.html?rref=collection%2Ftimestopic%2FRikers%20Island%20Prison%20Complex&action=click&contentCollection=timestopics&region=stream&module=stream_unit&version=latest&contentPlacement=4&pgtype=collection

[5]Michael Winerip and Michael Schwirtz, *New York City to End Contract With Rikers Health Care Provider*, N.Y. Times (June 10, 2015), https://www.nytimes.com/2015/06/11/nyregion/report-details-failings-of-corizon-rikers-island-health-provider.html?_r=0

years after The City of New York was aware of the unconstitutional medical care provided by Corizon at Rikers.

86. New York City Department of Investigation Commissioner Mark G. Peters said, "DOI's investigation found that Corizon did not provide adequate screening or supervision of its employees, and the City did not properly oversee this taxpayer-funded vendor, ignoring multiple red flags."[7]

87. As described above, Corizon, through its officers and employees, acting under the pretense and color of law, deliberately implemented a nationwide pattern and practice of delaying treatment, inadequately staffing facilities, hiring unqualified personnel, and failing to adequately train personnel in order to cut costs and maximize profits. Corizon implemented its policies with deliberate indifference as to their known, obvious, and proven consequences for patients: serious injury and death resulting from delayed, denied, and improper treatment. Corizon's policies, practices, and customs were proximate causes of Mr. Issac's injury.

88. The City of New York cannot credibly contend that it was unaware of the pattern of inadequate medical care at Rikers Island, and throughout the DOC system, and that they failed to take sufficient measures to investigate, discipline, and end this abuse.

89. Among the deficient policies of medical treatment, the City had a policy, custom, and practice of:

    a. Failing to properly escalate review of inmates with serious known medical conditions, including Mr. Issac, to staff adequately trained, with adequate credentials and experience, to allow them to identify appropriate and medically necessary treatment.

---

[6]Jillian Jorgensen, *City Drops Corizon, Rikers Island Health Provider, Amid Scrutiny*, Observer.com(June 10, 2015), http://observer.com/2015/06/city-drops-corizon-rikers-island-health-provider-amid-scrutiny/

[7]Mark G. Peters, *DOI Report finds Significant Breakdowns by Corizon Health, Inc.*, DOI Press Release (June 10, 2015), http://www1.nyc.gov/assets/doi/downloads/pdf/2015/June15/pr16corizonrpt_61015.pdf

b. Forcing methadone dependant persons, including Mr. Issac, prescribed lawful doses of methadone pursuant to state or federally approved medical care and treatment programs, into forced rapid detox and withdrawal.

c. Denying medical care to those incarcerated persons undergoing the forced rapid detox and withdrawal, including Mr. Issac, despite exhibiting systems of serious medical distress.

d. Failing to review impact of forced rapid detox and withdrawal on other ailments or the potential complications and risks of such a program in light of the overall health status of the incarcerated person, including Mr. Issac.

e. Failing to provide for ongoing monitoring and evaluation of the forced rapid detox and withdrawal by a medical professional with necessary medical qualifications and expertise concerning the impact of such a drastic detox as it might interact with other known ailments, illnesses, and diagnosed conditions.

f. Failing to provide for appropriate safeguards for heightened health monitoring while an individual, in this as Mr. Isaac, was subject to forced rapid detox and withdrawal.

g. Implicitly encouraging and condoning a policy of ignoring and dismissing the verbal and physical signs of extreme medical distress while an individual, in this case Mr. Issac, was undergoing forced rapid detox and withdrawal.

90. The policies, practices, customs, and usages, and the failure to properly train, screen, supervise, or discipline, were a direct and proximate cause of the unconstitutional conduct alleged herein, causing injury and damage in violation of plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its Fourth Amendment and the Due Process Clause of the Fourteenth Amendment.

91. As a result of the foregoing, plaintiff was deprived of liberty, suffered physical injury, conscious pain and suffering, emotional distress, humiliation, costs and expenses, and was otherwise damaged and injured.

## THIRD CLAIM FOR RELIEF
## MEDICAL MALPRACTICE
## UNDER THE LAWS OF THE STATE OF NEW YORK
*(Against the individual defendants and Corizon)*

92. The plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

93. Through the acts or omissions described above, the individual defendants deviated from the acceptable standards of medical care during their evaluation and treatment of Carlos Isaac.

94. Defendants jointly and severally caused injury, pain and suffering, and damage to Carlos Isaac. The acts and conduct of defendants were the direct and proximate cause of injury and damage to Carlos Isaac and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

95. As a result of the foregoing, Carlos Isaac suffered conscious pain and suffering, damage, injury, and economic loss.

## FOURTH CLAIM FOR RELIEF
## RESPONDEAT SUPERIOR LIABILITY
## FOR STATE LAW VIOLATIONS
*(Against Corizon)*

96. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

97. The conduct of defendants, alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as police and/or corrections officers, and/or while they were acting as agents and employees of defendants

Corizon, and, as a result, defendants Corizon, are liable to Carlos Isaac pursuant to the state common law doctrine of respondeat superior.

98. As a result of the foregoing, Carlos Isaac suffered conscious pain and suffering, damage, injury, and economic loss.

## JURY DEMAND

99. Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

WHEREFORE, plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.   That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.   That he be awarded punitive damages against the individual defendants; and

c.   That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.   For such other further and different relief as to the Court may seem just and proper.

Dated:   March 28, 2018
         New York, New York

Respectfully submitted,

By:   _____
      Gillian Cassell-Stiga
      Beldock Levine & Hoffman LLP
      99 Park Avenue PH/26th Fl.
      New York, NY 10016-1601
      t: 212-277-5824
      e: gcassell@blhny.com
      *Attorneys for the Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

CARLOS ISAAC,

                                    Plaintiff,

                    -v-

THE CITY OF NEW YORK, CORIZON, INC.,
CORIZON HEALTH, INC., CORIZON HEALTH
CLINICAL SOLUTIONS, LLC, CORRECTIONAL
MEDICAL ASSOCIATES OF NEW YORK, P.C.,
New York City Police Department Officer ("P.O.")
JUAN CABRERA (Shield No. 26123), P.O. JOHN
DOEs, and JOHN ROEs,

                                    Defendants.
-------------------------------------------------------------------x

**CERTIFICATE OF MERIT**

Index No. 17 Civ. 1021

STATE OF NEW YORK        )

                         ) ss.:

COUNTY OF NEW YORK   )

GILLIAN CASSELL-STIGA, an attorney duly licensed to practice law in the State of New York hereby affirms, pursuant to Section 2106 of the C.P.L.R., the following:

1. I have reviewed the facts of this case and have consulted with at least one duly licensed physician, whom I believe is knowledgeable in the relevant issues and I have concluded that there is a reasonable basis for this action.

2. That this certification is being made pursuant to Section 3012-a(a)(1) of the C.P.L.R.

Dated:       March 28, 2018
             New York, New York

                                    Gillian Cassell-Stiga
                                    Beldock Levin & Hoffman LLP
                                    99 Park Avenue PH/26th Fl.
                                    New York, NY 10016-1601
                                    t: 212-277-5824
                                    e: gcassell@blhny.com
                                    *Attorneys for the Plaintiff*

1